## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| HUMAN REGENERATIVE TECHNOLOGIES LLC; and SKYE ORTHOBIOLOGICS LLC, | ) Case No.: ) ) |
| Plaintiffs, | ) COMPLAINT FOR DAMAGES ) AND INJUNCTIVE RELIEF ) |
| v. | ) JURY DEMAND ) |
| PRECISION ALLOGRAFT SOLUTIONS, LLC; ALAMO BIOLOGICS, LLC; DOROTEA HOLDING CO., LLC; A. LEE ANDREWS, and DOES 1 – 10, | ) ) ) ) ) |
| Defendants. | ) ) ) |
| _____ | ) |

Attorneys for HUMAN REGENERATIVE
TECHNOLOGIES LLC and SKYE
ORTHOBIOLOGICS LLC

Alicia M. Barrs
Texas Bar No. 24109620
alicia.barrs@btlaw.com
Benjamin T. Pendroff
Texas Bar No. 24094893
bpendroff@btlaw.com
Josh Brandau
Texas Bar No. 24124297
Jbrandau@btlaw.com

1

**BARNES & THORNBURG LLP**
2121 N. Pearl St., Ste. 700
Dallas, Texas 75201
Telephone: (214) 258-4200
Fax: (214) 258-4199

Ryan Saba (pro hac vice requested)
rsaba@rosensaba.com
Laura St. Martin (pro hac vice requested)
lstmartin@rosensaba.com
Allison Owens (pro hac vice requested)
aowens@rosensaba.com
**ROSEN SABA LLP**
2301 Rosecrans Ave., Ste. 3180
El Segundo, California
Telephone: (310) 285-1727
Fax: (310) 285-1728

**TO THE HONORABLE COURT AND ALL INTERESTED PARTIES:**

Plaintiffs Human Regenerative Technologies LLC and Skye Orthobiologics LLC (collectively "Plaintiffs") bring this Complaint against Defendants Precision Allograft Solutions, LLC; Alamo Biologics, LLC; Dorotea Holding Co., LLC; A. Lee Andrews; and Does 1 - 10 (collectively "Defendants") as follows:

<u>**PARTIES**</u>

1.      Plaintiff Human Regenerative Technologies LLC ("HRT") is a Delaware limited liability corporation, legally qualified to do business and lawfully doing business in the County of Los Angeles and the State of California. HRT's principal place of business is located in El Segundo, California 90245. At all times pertinent to this litigation, HRT's Chief Executive Officer is and was Christopher Sharp ("Sharp"), an individual residing in California.

2.      Plaintiff Skye Orthobiologics LLC ("Skye") is a Delaware limited liability corporation, legally qualified to do business and lawfully doing business in the County of Los Angeles and the State of California. Skye's principal place of business is located in El Segundo, California 90245. At all times pertinent to this litigation, Skye's Chief Executive Officer is and was Sharp.

3.      Defendant Precision Allograft Solutions, LLC ("PAS"), a Texas limited liability company, is a tissue bank and/or processor/manufacturer of human tissue products with its principal place of business in San Antonio, Texas. Dorotea Holding Co., LLC, is the parent corporation and manager of PAS. A. Lee Andrews ("Andrews") is the Chief Executive Officer of PAS. Plaintiffs are informed and believe that PAS is a d/b/a for

Defendant Dorotea Holding Co., LLC.

4.     Defendant Alamo Biologics, LLC ("Alamo"), a Texas limited liability company, is a tissue bank and/or processor/manufacturer of human tissue products with its principal place of business in San Antonio, Texas. Defendant Andrews is the manager and Chief Executive Officer, and Dorotea Holding Co., LLC is the parent corporation, of Alamo.

5.     Defendant Dorotea Holding Co., LLC ("Dorotea"), is a Texas limited liability company, is the parent corporation of Defendants PAS and Alamo, and has its principal place of business in San Antonio, Texas.

6.     Defendant Andrews is an individual who Plaintiffs are informed and believe resides in San Antonio, Texas. Andrews maintains an office located at 5844 Rocky Point Drive, San Antonio, Texas 78249. Andrews is the Chief Executive Officer of both PAS and Alamo and is the Agent for Service of Process for PAS, Alamo, and Dorotea.

7.     Plaintiffs are informed and believe, and based thereon allege, that the business affairs of Defendants PAS and Andrews are, and at all times relevant were, so mixed and intermingled that they cannot reasonably be segregated, and are in inextricable confusion such that a unity of interest and ownership existed. Evidence of such includes (among other things) the comingling of assets and the use of Andrews' personal telephone, cellular phone, computers, Quickbooks, portable electronic devices, email accounts, bank accounts, and other personal devices and/or accounts in carrying out the actions alleged herein as and/or on behalf of PAS. PAS is, and at all times relevant hereto was, used by Defendant Andrews as a shell and conduit for the conduct of certain of Andrews' personal

4

affairs and is, and was, the alter ego of Defendant Andrews. The recognition of the separate existence of PAS would be unfair and would not promote justice, in that it would permit Andrews to wrongfully insulate himself from liability to Plaintiffs. Accordingly, Defendant PAS constitutes the alter ego of Defendant Andrews and the fiction of its separate corporate existence should be disregarded.

8.      Plaintiffs are informed and believe, and based thereon allege, that the business affairs of Defendants Alamo and Andrews are, and at all times relevant were, so mixed and intermingled that they cannot reasonably be segregated, and are in inextricable confusion such that a unity of interest and ownership existed. Evidence of such includes (among other things) the comingling of assets and the use of Andrews' personal telephone, cellular phone, computers, Quickbooks, portable electronic devices, email accounts, bank accounts, and other personal devices and/or accounts in carrying out the actions alleged herein as and/or on behalf of Alamo. Alamo is, and at all times relevant hereto was, used by Defendant Andrews as a shell and conduit for the conduct of certain of Andrews' affairs and is, and was, the alter ego of Defendant Andrews. The recognition of the separate existence of Alamo would be unfair and would not promote justice, in that it would permit Andrews to wrongfully insulate himself from liability to Plaintiffs. Accordingly, Defendant Alamo constitutes the alter ego of Defendant Andrews and the fiction of its separate corporate existence should be disregarded.

9.      Plaintiffs are informed and believe, and based thereon allege, that the business affairs of Defendants Dorotea and Andrews are, and at all times relevant were, so mixed and intermingled that they cannot reasonably be segregated, and are in inextricable

confusion such that a unity of interest and ownership existed. Evidence of such includes (among other things) the comingling of assets and the use of Andrews' personal telephone, cellular phone, computers, Quickbooks, portable electronic devices, email accounts, bank accounts, and other personal devices and/or accounts in carrying out the actions alleged herein as and/or on behalf of Dorotea. Dorotea is, and at all times relevant hereto was, used by Defendant Andrews as a shell and conduit for the conduct of certain of Andrews' affairs and is, and was, the alter ego of Defendant Andrews. The recognition of the separate existence of Dorotea would be unfair and would not promote justice, in that it would permit Andrews to wrongfully insulate himself from liability to Plaintiffs. Accordingly, Defendant Dorotea constitutes the alter ego of Defendant Andrews and the fiction of its separate corporate existence should be disregarded.

10.    At all times mentioned herein, each of the Defendants was the agent, partner, joint venturer and/or authorized representative of every other Defendant and, in doing the things hereinafter alleged, was acting within the course and scope of such agency, service, and representation and directed, aided and abetted, authorized, and/or ratified each and every act and conduct hereinafter alleged.

11.    The true names and capacities, whether individual, plural, corporate, partnership, associate or otherwise, of DOES 1 through 10, inclusive, are unknown to Plaintiffs who therefore sue said Defendants by such fictitious names. The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiffs. Plaintiffs are informed and believe and based thereon allege that each of the Defendants designated herein as a DOE was, and is, negligently, recklessly, and/or intentionally responsible for

the events and happenings hereinafter referred to, and thereby negligently, recklessly, and/or intentionally legally and proximately caused the hereinafter described injuries and damages to Plaintiffs. Plaintiffs will hereafter seek leave of the Court to amend this Complaint to show the fictitiously sued Defendants' true names and capacities, after the same have been ascertained.

12.    Defendants process, manufacture, and deliver finished tissue products made from the human placenta to third parties, including but not limited to, CTM Biomedical, LLC ("CTM"), for sale to medical facilities, hospitals, and health care professionals for use upon patients.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 18 U.S.C. § 1836 *et seq.* (the Defend Trade Secrets Act of 2016), because (among other reasons) the misappropriated trade secrets at issue are related to a product or service used in, or intended for use in, interstate or foreign commerce. The Court also has supplemental jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy.

14.    Venue is proper in this Court under 28 U.S.C. § 1391(b). This district is a judicial district in which a substantial part of the property that is the subject of the action is situated and is one in which Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

15.    Plaintiff HRT processes and manufactures biologic products made from

human placental tissue.

16.     These tissue products are used in both surgical and non-surgical contexts and are applied in Wound Care, Foot & Ankle, Urology, Podiatry, OB/GYN, ENT, Orthopedics, Spine, Plastics, and Cosmetics.

17.     HRT distributes its products through Plaintiff Skye. HRT is the manufacturing arm and Skye is the sales arm.

18.     HRT owns the trade secrets at issue in this Complaint, and Skye receives an intended benefit from HRT's ownership.

19.     The benefits of these products are limitless as they can speed up recovery time and prevent infection.

20.     HRT manufactures two categories of products: membranes and flowable particulated products.

21.     Membrane products are a flat "sheet" of tissue that look like patches and can be made in differing thicknesses depending on the materials and the specific processing techniques used. These help provide unique benefits for the various clinical and surgical applications.

22.     Particulate products are made from ground up tissue that can be mixed with liquid to inject or to pour into a specific area (otherwise known as a "flowable" product).

23.     If the particulates are not mixed with liquid, they form a paste-like product.

24.     These products are sold to hospitals, surgery centers, and medical facilities rather than directly to patients.

25.     In the human placental biologics marketplace, there are competitors to HRT

which make various products that are similar to HRT products, but not identical—that is, except for CTM's products. However, all manufacturers use various cleaning solvents and disinfectants and sterilize the final products to ensure that the final products are safe to be implanted.

26.     Many also use various types of machines to dry their tissues to be shelf stable.

27.     It is important to note that using the raw placenta, how a manufacturer cleans/disinfects or sterilizes, or what drying methods a manufacturer uses, is not what creates a unique or novel product.

28.     The processing methods that truly matter in whether products are unique or substantially the same are such specifics as the type of tissue components used and the combinations/permutations thereof, how they are measured and stored post-processing, temperature (frozen or ambient) and/or dried/dehydrated/hydrated, the ratios of tissue or tissues(s) used, the weights and amount of tissue (in milligrams) used in flowable or paste products and the mixing solutions for flowable products, dried by freeze drying / dehydration or kept hydrated, labeled as freeze dried, dehydrated, etc., how they are stored and kept in final packaging (i.e., either frozen or at room temperature), and the preparation of the tissue for use including whether parts of the tissue are removed or retained on a native tissue form, such as an amniotic membrane (amnion, chorion).

29.     Manufacturers in the placental tissue space have key steps, procedures, art, and know-how that differ from one another and create entirely unique products that allow them to differentiate themselves in the marketplace.

30.     HRT developed new and unique processing method steps where it created a

thicker, easier to use membrane, and a unique, non-dehydrated / non-dried, premixed and ready-to-use flowable product and non-dehydrated / non-dried paste.

31.    Plaintiffs invested significant resources toward research and product development, formulations, and processing methods, which comprise some of their most valuable trade secrets and corporate assets, particularly because the compilation of this information, including the processes and methodologies, is not generally known.

32.    Plaintiffs have taken significant measures to keep the formula and manufacturing process information confidential and secret.

33.    Among these safeguards, Plaintiffs require each of their employees, including independent contractor consultants, to execute confidentiality agreements and/or non-disclosure agreements as a condition of their relationship.

34.    Plaintiffs also control physical access to Plaintiffs' offices and information; use network firewalls, password protection, and security credentials to prevent unauthorized access to Plaintiffs' servers and internally shared documents; and revoke authorization at the end of any relationship with Plaintiffs.

35.    HRT imposes additional physical safeguards for its valuable trade secret manufacturing processes, some of which are: restricting physical access to portions of the building, the lab, and the hard copies of written processes – which are separated and locked in different file cabinets, each with differing access levels.

36.    HRT derives economic value and a significant competitive advantage from its product formulas and processes not being known.

37.    If these secrets were known to other human tissue manufacturers, HRT

would suffer significant harm.

38.    Skye is a third-party beneficiary of HRT's trade secrets because Skye distributes HRT's products, and any competitive harm to HRT also harms Skye.

### The Underlying California District Court Lawsuit

39.    Bryan Banman ("Banman") is an individual that previously worked for both HRT and Skye as an employee and/or independent contractor.

40.    Banman was paid to assist HRT and Skye and participate in the research and development of HRT's unique product formulas, specifications, sources of supply, packaging inserts, manufacturing procedures, and standard operating procedures on how the entire manufacturing division functioned step by step.

41.    Banman signed at least ten confidentiality agreements, or agreements acknowledging previously signed confidentiality agreements, requiring him to keep HRT's processing methods secret.

42.    Banman had access to, and intimate knowledge of, HRT's trade secret manufacturing processes.

43.    In 2014, Banman received a 10% ownership in HRT because of his assistance in the early product research and development and commercialization of the new novel product line.

44.    Banman resigned his employment from Skye in July 2018. Banman maintains that he did not technically leave HRT, and, despite the actions detailed below, Banman continues to receive distributions from HRT as a 10% member of the company.

45.    Unbeknownst to HRT or Skye, before Banman left, he began secretly

forming his own human tissue company, CTM, to wrongfully compete with HRT and Skye.

46.     Banman stole and misappropriated HRT's protected trade secrets and confidential information to clone HRT's human tissue products and to further his goal of intentionally harming HRT and Skye.

47.     CTM began selling "Connective Tissue and ExtraCellular Matrix (ECM) structural implants" with CTM brand names including "Boost"; "Paste"; "Flow"; "Thin"; "Thick"; and "X-Thick"—which are substantially similar, if not identical, to HRT/Skye's products.

48.     Plaintiffs filed a lawsuit against Banman, CTM, and various sales representatives, bringing claims under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962) ("RICO"), the Defend Trade Secrets Act of 2016 (18 U.S.C. §1836 *et seq*.) ("DTSA"), and California state tort claims for business interference in the United States District Court for the Central District of California, styled *Skye Orthobiologics, LLC, et. al. v. CTM Biomedical, LLC, et. al.*, case number 2:20-cv-03444-MEMF-PVC. ("*California Litigation*"). Defendants in this matter were not parties in the *California Litigation* matter.

49.     In the *California Litigation*, the parties entered a robust protective order to protect any trade secret information that would be disclosed during discovery.

50.     During discovery, Plaintiffs subpoenaed Alamo, seeking business records related to its relationship with CTM and any products manufactured for CTM.

51.     In response, Banman and CTM moved to quash the subpoenas in this District, styled *Banman, et. al. v. Skye Orthobiologics, LLC, et. al.*, case number 5:21-mc-

00663-OLG ("*Subpoena Dispute*").

52.    As part of the *Subpoena Dispute*, Banman and CTM argued that the subpoenas sought "highly-confidential and commercially sensitive information" belonging to CTM, "including trade secrets," and that CTM and Alamo had a "confidential business relationship" governed by confidentiality agreements.

53.    Banman submitted a sworn declaration stating:

CTM and an Alamo/Dorothea (sic) affiliate, Precision Allograft Solutions LLC ("Allograft"), are also parties to an "Agreement for Biomedical Materials" pursuant to which, among other things, Allograft manufactures tissue biologics products for CTM according to CTM's product formulas and specifications. The "Agreement for Biomedical Materials" is confidential and subject to a confidentiality provision. Alamo invoices CTM for these tissue biologics products. [Banman Declaration, Case 5:21-mc-00663-OLG Document 1 at p. 185 ¶ 8.]

54.    Banman also declared, under penalty of perjury:

CTM's product formulas and specifications are CTM's property. CTM's product formulas and specifications are confidential and proprietary business information. CTM takes reasonable measures to protect the confidentiality of its product formulas and specifications, including but not limited to, executing NDAs with third parties to whom disclosure is necessary, such as Alamo. If such information were disclosed, CTM would suffer competitive harm. [*Id*. at pp. 185-186 ¶ 9.]

55.    Further:

CTM's communications with Alamo representatives address confidential and proprietary business information of CTM, including but not limited to: information reflecting CTM's product formulas and specifications; standard operating procedures for CTM products; manufacturing instructions for CTM products; pricing and sales data; commercial terms of the CTM/Alamo relationship; and CTM's research and development initiatives. [*Id*. at p. 186 ¶ 10.]

56.    Banman specifically objected to Plaintiffs' subpoena to Alamo, declaring,

under penalty of perjury:

> The subpoenas served on Alamo and Dorothea (sic) seek confidential and proprietary information about CTM's business. Specifically, the subpoenas call for: (a) documents and communications concerning confidential product formulas and specifications; (b) documents and communications concerning confidential pricing and sales data; (c) documents and communications that disclose the confidential commercial terms of the CTM/ Alamo relationship; (d) documents and communications concerning confidential research and development projects for new product ideas and prototypes that have not been sold and that are not available in the marketplace. CTM treats this information as confidential. CTM takes steps to protect and prevent disclosure of this information with confidentiality agreements, non-disclosure agreements, and other protective measures. If disclosed, this information could cause competitive harm to CTM. [*Id*. at pp. 186-187 ¶ 12.]

57.    Banman ultimately dismissed his Motion to Quash, and Alamo produced documents pursuant to Plaintiffs' subpoena on October 19, 2021.

58.    This was the first time that Plaintiffs learned that Defendants were manufacturing products for CTM using HRT's substantially similar if not identical secret manufacturing processes.

59.    Plaintiffs also learned that A. Lee Andrews is the CEO of Alamo and PAS and the individual responsible for the manufacturing relationship between CTM and the Defendants.

60.    Alamo also produced a document showing that on June 10, 2019, Banman sent Andrews a "draft term sheet" that included details regarding order size, shipping, and packaging, and advising that "CTM will provide all product designs for CTM liquid matrix product and CTM particulate paste product, and processing specs for CTM amnion, chorion, and umbilical cord membrane products."

61.    The term sheet acknowledged that "Alamo does not currently produce or

14

distribute 'connective tissue matrix' or 'extracellular matrix' product and is not allowed to do so during the term of this agreement, or following the termination of this agreement, without the written consent of CTM Biomedical."

62.    Prior to meeting Banman, Defendants had never manufactured a flowable particulate product or the specific type of membrane they were manufacturing for CTM.

63.    Defendants and CTM entered into an "Agreement for Biomedical Materials" on August 29, 2019, which was a contract for Defendants to manufacture human placental products for CTM. The Agreement for Biomedical Materials contained "Exhibit B" titled "Quality Standards."

64.    "Exhibit B" of that agreement sets forth HRT's trade secret confidential manufacturing process step-by-step including, but not limited to:

    a.    The process to make membrane products specifies ten (10) steps with detailed instructions on processing methods and techniques that were discovered and developed by HRT and were unique to HRT.

    b.    The process to make particulate products specifies fourteen (14) steps for particulate mixed with liquid, and twelve (12) steps for the particulate not mixed with liquid, with detailed instructions on processing methods and techniques that were discovered and developed by HRT and were unique to HRT.

65.    Defendants had been manufacturing membrane products, particulate products, and flowable particulate products (particulates mixed with liquid) using HRT's trade secret processes since September 2019.

66.    Andrews never once asked Banman about where he received CTM's

specified formula and processing methods.

67.    Defendants do not have any research or development or any "design file" for the CTM products.

68.    In the *California Litigation*, Banman acknowledged under oath that the formulas he gave to Defendants qualify as trade secret with independent economic value such that disclosure would cause competitive harm and sought trade secret protection from disclosure in his Motion to Quash Subpoenas.

69.    On March 17, 2022, Plaintiffs took the deposition of Andrews in the *California Litigation*. At the time of the deposition, Defendants were put on notice that they were unlawfully manufacturing products using misappropriated proprietary information belonging to HRT.

70.    The *California Litigation* matter went to trial in the Central District of California on August 21, 2023, concluding with a jury verdict.

71.    During the trial in the *California Litigation*, Plaintiffs presented significant evidence establishing Banman's numerous breaches of his confidentiality and employment agreements with both Skye and HRT, and his breaches of his fiduciary duty and duty of loyalty he owed to Skye, as well as his deceptive and malicious conduct while doing so.

72.    After seven (7) days of trial, a unanimous jury rendered verdict in favor of Plaintiffs finding that Banman had unlawfully disclosed and used HRT's manufacturing process causing damage to HRT and Skye.

73.    On the Verdict Form, the jury responded "yes" to the following questions:

      a.    Did HRT prove that Banman used or disclosed HRT's manufacturing

process, including but not limited to HRT's formula for its flowable product, in breach of his contract with HRT? YES.

        b.      Did HRT prove that it was harmed and that Banman's breach of contract was a substantial factor in causing HRT's harm? YES.

74.     The jury also found that Banman breached his confidentiality agreement with Skye by using or disclosing "HRT's manufacturing process, including but not limited to HRT's formula for its flowable product." YES.

75.     Thus, the jury determined that Banman wrongfully used and disclosed to Defendants the steps for how to manufacture CTM products as set forth in the "Agreement for Biomedical Materials."

76.     The Central District of California in the *California Litigation* entered judgment on the verdict in favor of Plaintiffs on December 1, 2023, in the amount of $62,054,745.00. The damages consisted of lost profits and punitive damages.

**<u>Further Notice of Misappropriation to Defendants</u>**

77.     Following the verdict, Plaintiffs learned that Defendants were continuing to manufacture products using HRT's proprietary formulas and processing methods for CTM.

78.     On December 8, 2023, Plaintiffs sent Defendants a Cease and Desist letter putting Andrews and the other Defendants on formal written notice that:

        a.      Banman had acquired HRT's trade secret manufacturing process under a duty to maintain the secrecy of the information; and

        b.      Defendants were using and disclosing HRT's secrets to manufacture products for CTM.

79.     Accordingly, HRT and Skye demanded that Defendants immediately cease and desist from processing, manufacturing, or delivering any placental products for CTM as called for in the Agreement for Biomedical Materials.

80.     Counsel for Alamo responded on December 12, 2023, stating that Defendants will continue to manufacture the products, even in light of the jury verdict and judgment entered. Accordingly, Plaintiffs have no option but to bring this action to prevent further irreparable harm.

## FIRST CAUSE OF ACTION

**Misappropriation of Trade Secrets - The Defend Trade Secrets Act of 2016**

**(on behalf of Plaintiffs against Defendants)**

81.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 80 and incorporate them herein by reference.

82.     Plaintiffs' product development, product manufacturing process, tissue processing methods and techniques, and product formulas constitute trade secrets under 18 U.S.C. §1839(3).

83.     The information and/or documents Defendants misappropriated constitute trade secrets under the DTSA because they derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by, proper means by other persons who can obtain economic value from its disclosure or use, and because Plaintiffs took reasonable and practical measures to maintain the secrecy and confidentiality of their trade secrets and confidential information.

84.    Plaintiffs have taken various steps to protect their confidential, proprietary, and trade secret information, including by (among other things): (1) using network firewalls, password protection, and security credentials to prevent unauthorized access to Plaintiffs' servers, (2) using password protection and unique security credentials to prevent unauthorized access to internally shared documents, (3) limiting employees', consultants', and contractors' access to information to that which is necessary for them to fulfill their functions, (4) revoking authorization at the end of the relationship with Plaintiffs, (5) controlling physical access to Plaintiffs' offices, information, and documents, and (6) requiring all employees, consultants, and contractors with access to such information to execute confidentiality/ non-disclosure agreements.

85.    On October 19, 2021, Plaintiffs learned for the first time that Defendants acquired, disclosed, and/or used certain of Plaintiffs' trade secrets, and are continuing to use Plaintiffs' trade secrets, to manufacture and deliver products to CTM.

86.    Defendants have therefore misappropriated Plaintiffs' trade secrets.

87.    Defendants are using and/or disclosing these trade secrets that were acquired from Bryan Banman, and Defendants know or should know that Banman disclosed these secrets while under a duty to keep them secret and/or without Plaintiffs' permission.

88.    Defendants have been on notice that they are using and/or disclosing Plaintiffs' trade secrets since at least March 17, 2022, and received a formal Cease and Desist notice on December 8, 2023.

89.    Defendants are using and/or disclosing Plaintiffs' trade secrets to manufacture products for CTM and capitalize on Plaintiffs' investment of time, resources, and goodwill.

90.    Plaintiffs did not expressly or impliedly consent to Defendants' acquisition, disclosure, or use of their trade secrets.

91.    Defendants' misappropriation of Plaintiffs' trade secrets was and is willful and malicious.

92.    Defendants' misappropriation of Plaintiffs' trade secrets has caused Plaintiffs to suffer and will cause Plaintiffs to continue to suffer damage and irreparable harm, including continued harm to brand and business reputation, absent immediate injunctive relief.

93.    Because Plaintiffs' remedy at law is inadequate, Plaintiffs seek preliminary and permanent injunctive relief to recover and protect their confidential, proprietary, and trade secret information and the competitive and other benefits that information confers.

94.    Specifically, Plaintiffs seek an injunction preventing Defendants from continuing to manufacture products as specified in the "Agreement for Biomedical Materials," or any other product, using Plaintiffs' trade secrets and confidential information.

95.    Unless and until enjoined, Defendants will continue to receive the benefit of Plaintiffs' trade secrets misappropriated by Defendants, which have aided and will continue to aid Defendants to compete unfairly against Plaintiffs.

96.    Defendants' misappropriation has proximately caused damages to Plaintiffs, including but not limited to, loss of goodwill, competitive advantage, and business opportunities.

97.    Plaintiffs are informed and believe, and based thereon allege, that Defendants have been unjustly enriched as a further proximate result of their misappropriation of Plaintiffs' trade secret and confidential information.

98.    Defendants' actions in misappropriating Plaintiffs' trade secrets were willful, malicious, and were done with the intent to injure and oppress Plaintiffs and improve Defendants' own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## SECOND CAUSE OF ACTION

### Misappropriation of Trade Secrets – Texas Uniform Trade Secrets Act

### (on behalf of Plaintiffs against Defendants)

99.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 80 and incorporate them herein by reference.

100.    Plaintiffs manufacture and distribute placental human tissue biologic products. In connection with this business, and through the investment of numerous employee work hours and company resources over many years, Plaintiffs own and have the right to enforce trade secrets. Such trade secrets include Plaintiffs' product development, product manufacturing process, tissue processing methods and techniques, and product formulas.

101.    The information and/or documents Defendants misappropriated constitute trade secrets under the Texas Uniform Trade Secret Act because they derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information and/or documents.

102.    Plaintiffs took reasonable measures under the circumstances to keep such information and/or documents secret. They have done so by, among other things, (1) using network firewalls, password protection, and security credentials to prevent unauthorized access to Plaintiffs' servers, (2) using password protection and unique security credentials to prevent unauthorized access to internally shared documents, (3) limiting employees', consultants', and contractors' access to information to that which is necessary for them to fulfill their functions, (4) revoking authorization at the end of the relationship with Plaintiffs, (5) controlling physical access to Plaintiffs' offices, information, and documents, and (6) requiring all employees, consultants and contractors with access to such information to execute confidentiality/ non-disclosure agreements.

103.    Defendants misappropriated Plaintiffs' trade secrets by: (1) acquiring it and having actual or constructive knowledge that the trade secrets were acquired by improper means; and (2) disclosing or using the trade secrets without Plaintiffs' consent.

104.    Defendants knew or had reason to know that they had acquired the trade secrets through improper means.

105.    In addition, Defendants disclosed or used the trade secrets without Plaintiffs' express or implied consent. In doing so, Defendants:

      a.     used improper means to acquire knowledge of the trade secrets;

      b.     at the time of disclosure or use, knew or had reason to know that their knowledge of the trade secret was (a) derived from or through a person who used improper means to acquire the trade secret, (b) acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret, or (c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret; and/or

      c.     before a material change, knew or had reason to know that the trade secrets were trade secrets and that knowledge of the trade secrets had been acquired by accident or mistake.

106. On October 19, 2021, Plaintiffs learned for the first time that Defendants acquired, disclosed, and/or used certain of Plaintiffs' trade secrets, and are continuing to use Plaintiffs' trade secrets, to develop, manufacture, and deliver products to CTM.

107. Defendants have therefore misappropriated Plaintiffs' trade secrets.

108. Defendants are using and/or disclosing these trade secrets that were acquired from Bryan Banman, and Defendants know or should know that Banman disclosed these secrets while under a duty to keep them secret and/or without Plaintiffs' permission.

109. Defendants have been on notice that they are using and/or disclosing Plaintiffs' trade secrets since at least March 17, 2022, and received a formal Cease and Desist notice on December 8, 2023.

110.    Defendants are using and/or disclosing Plaintiffs' trade secrets to manufacture products for CTM and capitalize on Plaintiffs' investment of time, resources, and goodwill.

111.    Plaintiffs did not expressly or impliedly consent to Defendants' acquisition, disclosure, or use of their trade secrets.

112.    Plaintiffs are informed and believe, and based thereon allege, that Defendants' misappropriation of Plaintiffs' trade secrets was and is willful and malicious. Plaintiffs are thus entitled to recover exemplary damages and attorneys' fees, as provided by Tex. Civ. Prac. & Rem. Code §§ 134A.004(b) and 134A.005.

113.    As a natural and proximate result of Defendants' misappropriation, Plaintiffs have suffered and will continue to suffer damage and irreparable harm, absent immediate injunctive relief.

114.    Because Plaintiffs' remedy at law is inadequate, Plaintiffs seek preliminary and permanent injunctive relief to recover and protect their confidential, proprietary, and trade secret information and the competitive and other benefits that information confers. Specifically, Plaintiffs seek an injunction preventing Defendants from continuing to manufacture products as specified in the "Agreement for Biomedical Materials" or any other product through the use of Plaintiffs' trade secrets and confidential information.

115.    Unless and until enjoined, Defendants will continue to receive the benefit of Plaintiffs' trade secrets misappropriated by Defendants, which have aided, and will continue to aid, Defendants to compete unfairly against Plaintiffs.

116.     Defendants' misappropriation has naturally and proximately caused damages to Plaintiffs, including, but not limited to, actual loss, loss of goodwill, competitive advantage, and business opportunities.

117.     Plaintiffs are informed and believe, and based thereon allege, that Defendants have been unjustly enriched as a further proximate result of their misappropriation of Plaintiffs' trade secret and confidential information.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER

For all of the above reasons, Plaintiffs request that the Court award Plaintiffs all such damages available at law or otherwise pursuant to the claims and causes of actions set forth herein and for further relief to which Plaintiffs may show themselves entitled.

Dated: Dallas, Texas

February 13, 2024                           **BARNES & THORNBURG LLP**

                              By:     _/s/ Alicia M. Barrs_
                                   Alicia M. Barrs
                                   Texas Bar No. 24109620
                                   alicia.barrs@btlaw.com
                                   Benjamin T. Pendroff
                                   Texas Bar No. 24094893
                                   bpendroff@btlaw.com
                                   Josh Brandau
                                   Texas Bar No. 24124297
                                   Jbrandau@btlaw.com
                                   2121 N. Pearl St., Ste. 700
                                   Dallas, Texas 75201
                                   Telephone: (214) 258-4200
                                   Fax: (214) 258-4199

-And-

**ROSEN SABA LLP**

Ryan Saba (pro hac vice requested)
rsaba@rosensaba.com
Laura St. Martin (pro hac vice requested)
lstmartin@rosensaba.com
Allison Owens (pro hac vice requested)
aowens@rosensaba.com
2301 Rosecrans Ave., Ste. 3180
El Segundo, California
Telephone: (310) 285-1727
Fax: (310) 285-1728